The second case in which we'll hear oral arguments is number 06-1494 Baker-Hughes v. Reedhycalog. Mr. Mangum, how's it going? Thank you. And you've reserved five minutes for rebuttal, correct? I have, Your Honor. Thank you very much. May it please the Court, my name is David Mangum. I represent the appellant Baker-Hughes Oilfield Operations League. In light of the Supreme Court's decision in Metaview and the subsequent decisions of this Court applying the Metaview standard, the District Court's dismissal of the case based upon a found absence of subject matter jurisdiction can not stand. I would like to spend, with the Court's indulgence, my time talking about the alternative holding that the Court purported to suggest that he would dismiss the case under discretionary grounds, even if he were to find that there was subject matter jurisdiction. Well, Mr. Mangum, let me ask you, on the first point, certainly you're correct. The landscape was radically changed by, I guess most particularly, footnote 11 in Metaview v. Genentech. And we recognize that in Sandisk and Teva. But that said, isn't there a reasonable argument here, a proposition, that we should let the District Court, in the first instance, decide what I'll call the Article III case of controversy issue, recognizing it also would have to address jurisdiction if it found a controversy? Because, I mean, you've really got three bodies of evidence here on Article III, I think. You've got the letter that was sent from Reid Heidelog to the Baker v. Cedar, who we know about that's in the record. Then we have, and that letter speaks for itself. Then we have, though, conflicting evidence on what happened in a subsequent telephone conversation. Correct? Correct. Then we have, finally, also some question about what this Reid Heidelog representative told someone from the Kuwaiti Oil Ministry, or whatever it was. So, don't those conflicting facts have to be sorted out in order to make a determination on an Article III issue, before you've got to the discretionary issue? Well, I think Your Honor— Sorry to go on for so long. No, absolutely not a problem. I think the evidence, and under the metamute standard, there's clearly substantial evidence to support that there is a substantial and concrete controversy here, in terms of they have patents, those patents have issued, we are selling devices that have this polycrystalline diamond compact in it that they allege infringe on their patents. So, we have a concrete controversy that has been raised, and you don't really—regardless of the resolution of those additional facts, there is a concrete controversy under Article III of the Constitution, because they have issued patents that they have put on themselves. So, you can't get that solely on that letter? I think, Your Honor, in terms of—the test is a totality of the circumstances test, and we don't any longer require reasonable apprehension, although I think there's substantial and sufficient facts to have been a reasonable apprehension of a patent infringer. The letter simply said, here are these patents, and also it was sent out to, I think, more than just your client's subsidiary, is that correct? It was sent out to everyone in the industry that has these PDC polycrystalline diamond compact covers, and that uses them. And, in fact, it was sent to U.S. Synthetic, who also brought a declaratory judgment action. It was sent to U.S. Synthetic's customers, who are now joined in the litigation. You know, I sent out—I'm sorry, I said I sent out. I'm listening to you. I brought the men into the University of Genentech, because I want to make sure I got this right. The court said there, our decisions have required that the dispute be definite and concrete, such in the legal relations of parties having adverse legal interests, and that it be real and substantial and admit of specific relief through a decree, etc. Now, are you—what you're necessarily saying, Mr. Manning, is that that letter that was sent out by me, I belong to your clients and other people, met that requirement. And that—I realize there are business subtleties here, but isn't that reading a lot into that letter to say that it meets that requirement? Well, I think, Your Honor, there's a combination of the letter, there's a subsequent communication. But you don't have a dispute with regard to—the only aspect with regard to a dispute on that communication regards specific conduct with a statement about U.S. Synthetic's infringes, you're buying U.S. Synthetic's cutters, therefore, we're going to sue. There's no dispute with regard to statements that they said, these are—these patents are our crown jewels. There's no dispute with regard to statements that we intend to vigorously enforce these patents against the industry. So we have a concrete controversy here. Article 3, I believe, Your Honor, is clearly satisfied. And then on top of that, you know, you have the facts where they then end up in the marketplace making statements through their agents that— But again, there's a dispute about that. Yes, there's dispute with regard to aspects of the— Necessarily, doesn't your case, though, from what you're saying—you're making your argument probably—necessarily, doesn't your case say that—come down to the bedrock principle you're arguing for is that if Company A has a patent and it sends a letter to Company B that is in the industry and says, here's this patent. We understand you made Widget X. That's enough. I believe that is enough. But that's what you're saying. I do. That's not—that's not what's necessary to bridge this. Unless there's a level of law. Absolutely. If you have a patent, and then—in fact, I think, Your Honor, that really, if you look at footnote 11 of Benedict, you can have a circumstance where a patent has issued. Someone takes the position that there is a plausible interpretation of that patent that covers their product and that that can create— You mean without any action on the patent at all? I think, Your Honor, there are circumstances. I mean, we have, for example, in the case where someone publishes their patent in the Orange Book, and you have a product that you think arguably comes within that—the scope of that patent. I think that can create a justiciable controversy under the Medellin decision. I think the Medellin decision is very broad with regard to when there's a concrete controversy. If there's a patent out there, and you believe your patent can legitimately—that the patent can be interpreted to cover your product, I think—and in fact, I think there's a reference in some of this Court's decisions. If you send a quote-unquote put-up-or-shut-up letter to the patent owner, and the patent owner does not respond and say, We do not believe that you infringe. We are giving you a covenant not to sue or denying that there's any infringement here, that that can create a justiciable controversy under the Medellin decision. But this letter was not a put-up-or-shut-up letter. This was a letter saying, You make certain things, and we have these patents. You should be aware of these patents, yes. And then that— We wish to bring—to quote it, we therefore wish to bring to your attention the following patents. And then certainly there are other decisions where the, Here's some patents that may be of interest to you, is the letter. But what that means to you, Your Honor, is then an inquiry made by the president of Hughes Christensen, where you contact the president and say, Well, I've received this letter from you. And then they have a discussion. And while there's a dispute about some of the specifics of that communication, there is no dispute that he informed Mr. Burgess that these patents were important patents to them, that they were considered the crown jewels of the company, and that they were going to vigorously enforce those. The only dispute is with regard to how much investigation had been done by Reed Heikelaar at that point with regard to actually examining the Hughes devices. But with that communication and the indication that they would vigorously enforce those patents, I believe, under Medellin, there was now a concrete controversy. So let me ask you this. Suppose, and this is obviously hypothetical, but suppose upon receiving that letter, your client had written a letter back saying, Thank you very much. We want to consider your letter. We'll respond to you in 30 days. Okay? Now, assume that was all you had. What would be the situation then, would you say? Would there be what I'll call a Article III case of controversy as the Supreme Court has spelled it out at that point in time? Well, there are subsequent, I think, with regard to some of the decisions that is possible depending upon the accused device and the person's position with regard to their accused device. You have several cases that have been decided by this court, the Genentech case, Electronics for Imaging case, the Capital case are examples, where you have a deadline set where there's going to be a discussion and you say, well, if you don't enter into a negotiation. I'm posing a hypothetical where your client writes back and says, Thank you. We received this letter. We appreciate you bringing these patents to our attention. We're going to look at our product and we will respond to you in 30 days. A very non-confrontational response to the letter that was sent to him. At that point, would you say that under what the Supreme Court has said, there's enough? There could be if the party then looks at its product and decides that there is a responsible interpretation of the claims of that patent that would encompass their product. I don't believe that the defendant in that circumstance or the accused person would have the obligation to go back and say, Well, we've looked at this and we believe that while there may be a plausible interpretation of your patent that covers our device, we don't believe that's the proper interpretation and it has to wait for then some other response from the patent owner. I think if the person then looks at that and says there is a plausible interpretation of this patent, we don't believe it's the correct interpretation of this patent that could potentially encompass our device, they could bring a declaratory judgment. Taking the hypothetical one step further, if they engage counsel and counsel's opinion was that the alleged infringer at this point's device does not infringe the patent, no infringement, at that point, is there a case of controversy? Well, I think you have facts like that in some of these cases. Well, you don't have to concede that you infringe. That opinion letter, for example, Your Honor, could say that there are multiple possible interpretations of this claim for this patent. We believe that the proper interpretation of this patent is this, this, this, and this. Under that interpretation, you would not infringe. But I don't think that removes the possibility of a case of controversy because we all know that the claim construction issue can go different ways. I think the metamune decision and the subsequent decisions that have been issued by this court very effectively broaden the situation under which somebody can be bringing a DJ action. And I think any patent owner that puts someone on notice of their patents and that person or entity has a product on the market that potentially comes within the scope of that patent, that they have created the possibility of declaratory judgment action. I notice that I'm now into my rebuttal time. Briefly, with regard to the discretionary issue, the pattern in this court's decisions since metamune has been to reverse or vacate and remand and allow the district court to again exercise its discretion or to apply the facts. I believe in the circumstances of this case that there's a clear abuse of discretion with regard to the court's purported exercise of its discretionary authority in two respects. One, there was no evidence in the record to justify the court's analysis in suggesting that there were ongoing negotiations or a possibility of settlement. And that this district court's decision is upheld based upon this exercise of discretion. In every case, there's a possibility of some settlement. Here, there was no evidence in the record, no affidavit or declaration that established that there were ongoing negotiations. In fact, the facts are uncontroverted that at the time the declaratory judgment action was filed, there had been. There were no discussions toward settlement or licensing of the patent. Second, I believe the district court's reference to this court's decision in the EMC case well stretches that case. That case was a circumstance where the court found that there were ongoing settlement discussions and negotiations towards licensing. And that the D.J. action was filed for the purpose of leveraging those negotiations. In this circumstance, when we re-hypelog files the patent infringement case five and a half hours after inducing the district court to dismiss its case, the proper analysis should focus on where this case was first filed and the case should proceed ultimately to trial in Utah. And I believe there are circumstances and procedures available for the court to deal with the judicial economy interest to the extent there may be a case still going forward in the Eastern District of Texas. And in particular, one way that this could be resolved is the same way that you do under a 1407 situation, where the cases could remain consolidated in the Eastern District of Texas for the pre-trial and claim construction proceedings. And then when and if it comes time for trial, the case could be then sent to the Utah District Court to first file the case for purposes of trial. Could I ask you just a quick factual question? Absolutely. I don't have this against Conn. The declaration of Dan Scott, which is the declaration through which the conversation in question comes in, recites. It's not a direct declaration of one of the parties to the conversation. Instead, it recites a second conversation between Mr. Scott and Mr. Burgess, who was a party to them. There's a reference to Mr. Burgess as being, at the time, the president of HCC. Is Mr. Burgess unavailable? Mr. Burgess is no longer affiliated with Baker Hughes. He's still alive, but Mr. Burgess was not willing to provide an affidavit because he did not want to get involved with people. Thank you, Mr. Mangum. Thank you. We'll restore your vote. You had a number of questions. We'll hear from Reid Heitkala. Mr. Hatch? Thank you, Your Honor. Mr. Hatch representing the Reid Heitkala defendant. Just as a point to Your Honor's question, the last question, I think what Mr. Mangum has indicated to you is somewhat inaccurate. He may not be there now, but at the time of that declaration, my understanding is he was employed there, and that's what I think we found so amazing about that declaration, is that they didn't get it from their own employee, and if he wasn't an employee, he was somehow still under a contract, a consulting contract or something with them. I take it from the context, it appears he wasn't present at that point. I think he was. We understood it from talking. We tried to talk to him as well to see what had happened because it was inconsistent with what his testimony was inconsistent with what was told to what our employees understood, and he wouldn't talk to us because he still had some ongoing financial relationship with Baker Pew. This really goes to a broader question, I think. Sure. The extent to which there is a dispute about the contents of this, I take it that nobody disputes that there was a conversation between Mr. Dean and Mr. Burgess. No, as a matter of fact, as you know, in the record, we submitted an affidavit from Mr. Dean indicating what actually was talked about, and what he says was talked about is rather significant, and I think it's somewhat consistent with Your Honor's concurring opinion and Sanders' because you used the put-him-for-shut-up language, and that's exactly what happened here, according to Mr. Dean. Now, understand this is an affidavit that's well before Sanders' back when the test was reasonable apprehension, and Mr. Dean said that I informed him, me and Mr. Burgess, and this is at 877 in the record, that Reid Heiblot had not looked into the matter and was unaware of any infringement by HCC, which is the Baker Pew subsidiary. He says, unaware of any infringement. I mean, that's the exact question Your Honor said you should ask them to determine whether there is a concrete controversy, and apparently that was the discussion. He specifically said at that time, we had not looked into the matter, unaware of any infringement by Baker Pew. I further stated that the purpose of the standard notice letter was merely to inform Baker Pew of the existence of Reid Heiblot's patents. My conversation with Mr. Burgess was cordial and no litigation threat was suggested. That's what the record is, and I think Judge Holderman raised the issue of the letter itself, and the letter itself, we're getting dangerously close. I understand that we've taken a step back from reasonable apprehension because of the Meadowmune decision and now this Court's decision in Sanders, but now we're being asked to step down one more and essentially say, if you have a patent and we have a product, subjectively we're going to worry about whether there's a controversy. So our subjective belief is enough to create an Article III case of controversy, and I don't think that really can possibly be the standard. Let me ask you, it does seem that there's no question that footnote 11 in Meadowmune radically changed the landscape, and not to tip my hat, but it seems to me it would be very difficult for us to just flat out affirm this case, given the new environment, if you will. Don't we have to send it back for some purpose? Now the question is, do we send it back, and again I'm just speaking for myself, not when I say we, not our panel of colleagues. Do we send it back for the judge to make an Article III case of controversy determination, and then look at discretion, or do we just send it back for discretion? Well, I have a couple ways to approach that, Your Honor. One is, I think based on the record here, and let me start by saying, I don't know that we necessarily need to say that the Meadowmune case forced a radical departure, particularly as applied to the facts of this case. In the Meadowmune case, of course, there were extensive, there were contractual dealings between the parties, there were extensive negotiations, there was a request to pay royalties with, you know, a... I'm not thinking of footnote 11 in the Meadowmune that did away with our reasonable apprehension of suit test, and then, as we've talked about in the Sandisk most important one. Well, that's fine. Then I go to Sandisk, and Sandisk is a case, of course, as Your Honor is aware, where there were allegations of specific products, specific infringement, the parties engaged in extensive negotiations, where the elements of claims were mapped out. There was an actual controversy there. I think this Court can find, based on this record, that there is no such thing, even if the test is different. Clearly, the district court applied the test that existed at the time, but even applying the test, as we understand it, from Meadowmune and Sandisk, here, we have to look at the facts themselves. One, we have a letter. The letter has no mention of a threat. It is only a notice letter of patents, and the interesting thing here is this has been sent to everybody in the industry, and yes, eventually, some of these parties have been sued, but some of them have not been, and a letter of that nature in this industry, where you have a patent, can also be akin to simply a marketing tool, and I don't think that... Would you think of a potential license? For instance, Baker Hughes here does not make PDCs. They buy them from other people, and so to be able to say, I have a patent because I have a new way of doing it that's better than what everybody else has, that's a marketing tool, and I don't think this Court should ever get to the point where it says just mentioning patents creates a case of controversy, particularly working with our customer, where it certainly could be the intent and the expectation that we've got something better, we hope Baker Hughes buys our stuff. We've got a new patent, it's good stuff. So this was a selling device? Well, I'm not specifically saying it is or it isn't, but I'm saying is if as a matter of law the test is you just send a letter and mention four patents, and that's enough to create a controversy to someone who's a customer of, in this case, PDCs, then where's the line? At that point, it's just owning a patent means anybody can sue you at any time if they have a subjective belief that they infringe a product, and I don't think that's the test. Certainly, Matt, you didn't go that far. Now, go get to the conversation, because that's what actually concerns me the most, and there is, you're right, the two versions of the conversation just don't exactly meet up, but it seems to me that it is at least not inconsistent that, let me see, Mr. Dean's affidavit, I guess it's not inconsistent with Mr. Scott's version of Mr. Burgess' account of the conversation to this extent. Correct me if I'm getting this wrong in your view, but at least there's nothing in Mr. Dean's affidavit that disclaims his having referred to the other parties in the industry having been subject to the guilty infringement of the Reed High Club patents, correct? I think he specifically said that. He said he didn't do that. Well, I'm not talking now about saying that with respect to… You're talking about other people. Other people, yeah. The argument that Mr. Scott, the issue that Mr. Scott raises is, did he say in this conversation, other people, such as USS, are infringing, and by the way, they're providing these PBCs to a lot of other people, with the implication being that those people to whom they are providing the PBCs are also by using those PBCs infringing. You're not actually saying that. Yeah, two things I would like to say about that. One is I think that's inaccurate. If you look again at his affidavit in the appendix to 7.7, in paragraph 11, Mr. Dean specifically says, I never engaged in a conversation or any type of communication with anyone in favor of these, in which I stated that I had collected PBCs from various CD manufacturers and believed that the manufacturers of those PBCs were infringing on patents. Specifically, he says he didn't do that. And then two, in paragraph 15, he says he's not been authorized to file any patent infringement lawsuits. And so the clear implication of both of those is that he hasn't said those things. And the more amazing thing, and the reason I think this Court, getting back to something Judge Schall said, because I still haven't completely answered your question, is why I think this Court has enough of a record to rule, they know that this doesn't reach the test, is Mr. Scott's affidavit really doesn't put that at issue. This isn't even really admissible evidence of any kind. I mean, he is trying to say— It's a hearsay problem. No, it's clearly hearsay. He says Trevor Burgess, the president of ACC at the time, telephoned Mr. Dean. Within a few hours, Mr. Burgess relayed the contents of the conversation to me, he says. So it's clearly he's not party to it. He didn't hear it. And he's now saying something that Mr. Burgess, who they had access to at the time, could have told him. And then this is what he says to get—at that point, they're trying to establish reasonable apprehension of suit. And he says, in the conversation in which Mr. Burgess relayed to me the substance of the telephone call with Mr. Dean, it was apparent to me by the—by what? Not by words. By the manner in which Mr. Burgess reacted to Mr. Dean's statements, that Mr. Burgess believed that Reid-Hypolog intended to sue will get manufactured. So here's what we're creating, an actual concrete controversy. Well, here, the argument would be that he was so agitated that something must have been said. You know, the conversation wasn't come over to have lunch with me. It was something more ominous. Well, he could have said something about his mother. I mean, who knows? So that isn't really, it seems to me, the—that's fluffy. I agree with you. It's the prior paragraph, 6b and c, that seems to me contain the grist, to the extent that there's grist here, of the argument that there's this sort of indirect assertion of infringement. That is to say, according to Scott's version of Burgess' theory, that Dean said, there are people out there making this stuff. It infringes. And therefore, those people out there, we don't know if you're one of them, but who buy it, are also infringing. I set up the response to your question slightly differently because I emphasized the hearsay portions of this. Because that can't be evidence. So I'm saying this whole affidavit really can't be evidence to establish the controversy. And then I pointed out that as to those questions, those statements that he made, hearsay statements at B and C, that Mr. Dean, who was part of the conversation, did submit an affidavit as evidence that no such things were ever talked about. So we're really trying, in essence, and if you put this in context, I don't know if Your Honor's got this from the record, but another suit had been brought before this. And largely, this is, to a certain degree, appears to be another manufacturer, USS, who I think Baker Hughes has bought PDCs from in the past, potentially trying to manufacture some type of controversy. Because they're going out and they're getting hearsay declarations. They're taking a letter that does nothing more than inform a patent and say, here we've got a potential lawsuit. Now the interesting thing here, too, is they've sued on, and this goes part to, I think, the discretionary aspect of this and some of the practical effects of what happens now that the lawsuit is going forward in Texas, is they've sued on 12 patents. You'll notice the letter to them only had four patents. And the lawsuit against them in Texas is only on four patents. These same four? I believe so. I think so. But that raises the question, Your Honor. I mean, he's raised a little over-compulsive kind of claim. That aside, where is the substantial controversy on the other eight? Where did they get that from? They don't even have a letter on the other eight. It was only on four. So they have to derive that from somewhere else. But where? The only lawsuit is on the four. So, you know, this is a client, I mean an appellant here, who is trying to get this court to take metamune from, you know, a set of facts that have a considerable amount of actual concrete controversy under Article III. This court's now putting out 11, redefined it in Sandus' case in a fact situation where there really was a really concrete controversy. And, you know, I kind of wrote it down in layman's terms. I mean, it seems like the prior test was here was a patent, we thank you and friend, and we're going to sue you. And the new test seems to be here's a patent, and here's your product, and, you know, we want to license you. You know, it doesn't have to be, it has to be almost the same as a suit. Because that's what happened in Sandus. They could have said we want to sue you, but they say we want to license you. Or we're laying out the elements, we're mapping out the elements in negotiations. So there's a concrete. The only thing here was we have here's a patent. And we have some hearsay statements. And we didn't talk about the statements of the alleged Kuwaiti guy. But, I mean, it's so fanciful. I mean, it wouldn't be evidence that would stand up if we were trying this case. And, if anything, it would be hotly contradicted. So then we get to, I think, what I think is still an important issue, and it's the discretion of the court. Because one thing that Matt Amin didn't do is it didn't take away the discretion of the court. And Matt Amin, I think at pages, I think it's 776 to 777, Matt Amin even re-emphasized the district court's discretion on equitable and prudential grounds that even if there is a controversy. Yes, let me ask you that. And assume for the moment one were to conclude, I mean, Mr. Magnin says that we should just flat out defer this and not even have consideration of the discretion. But suppose, assume for the moment one were to send the case back and say there is an Article III case of controversy. Wouldn't the judge have to say in that circumstance why he was exercising discretion not to entertain the suit? I mean, because here, the record here, as I recall, he just said, in any event, I would find it's a matter of discretion that I wouldn't entertain the suit. It doesn't have to be some kind of an explanation as to why discretion is or is not being exercised in a particular way. Well, I think I answered two points, and may I continue? Oh, yeah, I promise. I'm going to let you, because Mr. Magnin is getting some additional time. Thank you, Your Honor. I'd say two things. One is the court had indicated that it was aware that there were extrajudicial dispute resolution processes going on. Mr. Magnin questions that on an evidentiary basis in his reasoning. It's an oral argument. The reality is that representation was made to the court in an oral argument. They did not dispute that. And so they're trying to put some odd evidentiary obligation on us to prove that we didn't have these negotiations, when they've never denied it. They know that they've happened, and it was discussed openly with the court. The EMC case in particular, and there's been nothing to overrule, that that's not a good basis for the court to exercise its discretion. So I think here we already have a proper basis for the court to make that discretion. I think if it were to be sent back, but I think Your Honors can certainly take judicial notice of that, is the policy behind a declaratory judgment action is to remove unnecessary uncertainty and delay by a lawsuit if there is some controversy by it being put off for a period of time that might injure the rights of another party. Now while we deny that that was an occurrence here, the fact that there is ongoing litigation in Texas over these same patents and same issues would indicate that the policy behind a declaratory judgment action has already been resolved. In that regard, this case has, like Sandisk, has started the smell of dispute before, more than anything else. In a lot of cases things played out in Sandisk. Well, a lot of people bring D.J. actions for just that purpose. I don't think you can smear either side with that because I think... No, that's right, but I think it's hard to say which way this cuts. Each of you has argued that the filing of the lawsuit shortly after the resolution of the jurisdiction dispute cuts in its favor, and I felt the same way at the end of Sandisk that what everybody was all excited about wasn't really what's at issue in the D.J., it was formal. Well, that's one fact that they have that's kind of sexy, is that there was a suit filed shortly after the suit. Exactly the same thing happened in Sandisk. Yeah, and I understand that. But let me say it this way, looking at it as a practical matter. Baker Hughes brought this declaratory judgment action as a customer, not as a manufacturer, as one of the mainline people who would normally have gone after him. It's very likely that they brought themselves into this and got themselves sued in Texas because they made an issue of it, because I don't think they would have normally been a frontline person. But the case in Texas, as a practical matter, is the same things, and it has other parties in it which can't be brought to Utah, which aren't going to be brought to Utah, and that case is going to go forward. And so what they're asking for is let's do it in two different places. He said, well, we can do the pretrial stuff there and then bring it to Utah. You can't do that. The USS is in there. Hal Burton is in there. USS is their supplier. They inevitably have to be there because of the fact that it's their cuts that are at issue here. And Mr. Manning is going to say, well, bifurcate us out. Try them in Texas and us in Utah. Well, where is the practical reason there? And where is the policy behind a declaratory judgment action that gets you that type of a relief? I don't think there's any. And so as a matter of practicality, I think these are all matters that are before Your Honor. They remain part of the record. I think this court has enough to affirm on the new standard and on discretion the lower court below. But I agree it's always an option for Manning to decide these things. But they're here now before you, and I think you have the power to do what's necessary. Thank you very much, Your Honor. Thank you as well. One further question, maybe just a quick factual question. I think in your brief you point out that the hearsay-laden declaration is the way you characterized the Scott declaration. And you say it was disputed, it's unreliable as such. This was a point that you raised in the district court, the hearsay nature of the Scott declaration. Yeah, well, we raised everything. I think that in the briefing and in the oral argument, because, I mean, that was a hot issue because we disputed very hotly the fact that Mr. Dean ever said that was why we filed the affidavit. Right. I guess my question is, did you argue that it was hearsay and did the court respond in any way to the hearsay? I don't recall a court comment on that. The court responded in this way, and I think it's in his decision, because I'm not going to get to it right away. But I think he tried to read the facts in the light most favorable to them. And I believe at one point he said, I'll take the facts that you're saying to decide whether they're reasonable or not. But I find your version of the facts to be somewhat misleading, I think was the exact word that the judge used. And so the judge didn't spell it out because it wasn't necessary under the old standard for him to do that. But it was considerable. Thank you. Thank you very much. Any other questions? Mr. Maynard? Thank you, Your Honor. You have your rebuttal. Let me respond with a couple of statements. One is with regard to the letters. There are two letters that cover all 12 patents. The letters are at A177, the appendix, and 179 and 80. The first letter covers eight patents, nine patents. The last one covers three plus some pending applications. So all 12 of the patents that are the subject of the D.J. action in Utah were part of the letters. The reference that suggests that U.S. Synthetics is Baker Hughes's supplier is not accurate. U.S. Synthetics supplies Halliburton. Baker Hughes's supplier is a company out of Ireland. Baker Hughes is the company that has the largest market share with regard to PEC, so the suggestion that they were not the target in this litigation strategy is inaccurate as well. With regard to the Scott Declaration, to respond to Judge Bryson's suggestion, there was an argument made about it being hearsay, but the court took those facts as established and said even finding all the facts in the suggestion of Baker Hughes, that he would find that there was no jurisdiction. It does appear to be hearsay. You wouldn't contest that? I don't contest at all that it is. The reason we submitted it, besides the fact that Mr. Burgess was not available, he would not give us a declaration because he just flat out did not want to get involved. Was he still working for you at the time? No, he's not employed by the company. At the time of the declaration? Non-employed at the time of the declaration. And not otherwise retained by the company in any capacity? No. He had some continuing compensation with regard to the company from his being the former president, but was not employed, not our agent, not anyone that we had control over. And I think the importance of the Scott Declaration as well is it's reflective of what the conduct of real high colloid caused within Baker Hughes. They started to prepare for patent litigation, the same as if an express threat of patent infringement had been made. Well, that seems to me pretty thin soup. I mean, if you've got somebody who gets all flustered at virtually nothing, that can't really be a stronger basis for a declaratory judgment action than somebody who is a little hardier and doesn't get easily flustered. But what I think the declaration reflects, and I think the way to resolve this, is if you take, as the court was doing, if you take those two declarations and you look at the aspects where the declarations do not dispute each other. I mean, Mr. Scott's declaration is out there. They're there as a response from Mr. Dean. So Mr. Dean knows exactly what he's responding to. And if you look at Mr. Dean's declaration in light of what Dan Scott says, there are aspects of what Dan Scott reports about that communication, which is hearsay. Burgess told me this. There are aspects of that conversation that Mr. Dean does not deny. He does not deny that these patents, that they were told that these patents were the crown jewels of the company and that they were going to vigorously pursue and enforce those patents. Now, the other thing, and to respond to Judge Schall's comment about remand and what would be available on remand, the record does not contain, because the record was only established at a certain level. We've proceeded with the litigation in Texas, and I can report to the court that on remand, there will be additional evidence from the files of re-hypelog that draw into question some of the declaration statements of Mr. Dean with regard to what type of examination had been done about the U.S. synthetics cutters and also about the Baker Hughes equipment. So there is substantial information that we'll bring to bear on the issue of both the actual case of controversy and on the exercise of discretion. And I just submit with regard to the exercise of discretion, it cannot be the law that as long as there is a possibility of settlement that the district court has the ability to say, I don't want to hear this case. This court made it clear in the Genentech case and also in the case of electronics for imaging that there is an obligation on the part of the district court to hear cases of controversy that are before them. There's also a strong presumption in favor of the forum in which the case is first filed. What's happened here is that re-hypelog, rather than facing the forum issue straight up and saying they need to remove the district court in Utah to transfer the case to the Eastern District of Texas, which by the way, there's absolutely no connection between this lawsuit and the Eastern District of Texas. There seems to be a connection between the Eastern District of Texas and every patent case. There is. There is. But U.S. synthetics is located in Utah. The Hughes-Christensen division of Baker Hughes, which is now in Houston, was previously in Utah, and that is where many of the witnesses and others are. But there's no connection in the Eastern District of Texas. It's not re-hypelog's home forum. It's not U.S. synthetics' home forum. It's not Halliburton's home forum. It's not Baker Hughes' home forum. And what's happened— Thank you. Thank you, Your Honor. Your time is up. I think we have the arguments. Thank you, Mr. Hatch. Thank you. Case is submitted.